**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 50747**

| | |
|---|---|
| In Re:  2023 Application of John Doe (2023-32) to the Idaho State Bar. ) ) | |
| ------------------------------------------------------------ ) | **Boise, December 2023 Term** |
| **IDAHO STATE BAR,** ) ) | **Opinion filed: June 12, 2024** |
| Petitioner, ) ) | **Melanie Gagnepain, Clerk** |
| v. ) ) | |
| **JOHN DOE (2023-32),** ) ) | |
| Respondent. ) | |

Petition from the Idaho State Bar.

      The Petition of the Idaho State Bar is <u>granted in part</u> and <u>denied in part</u>.

      Idaho State Bar, Boise, Petitioner. Joseph Pirtle argued.

      John Doe, American Falls, Respondent pro se. John Doe argued.

_____

PER CURIAM.

      The Idaho State Bar has filed a petition with this Court requesting permission to reject a bar application from "John Doe"[1] and seeking an order prohibiting him from filing future applications for either (1) a period of five years, or (2) until the applicant receives written permission from this Court. Doe filed a response and cross-petition seeking immediate admission to the Idaho State Bar (the "ISB"). For the reasons explained below, we deny the ISB's request to impose a five-year ban on Doe filing future applications and, instead, impose an alternative remedy. However, we grant the ISB's petition in part, concluding that it is not required to process Doe's third application, which was filed just 36 days after the denial of his second application became final, because Doe has failed to show a substantial change in his fitness and character from the two prior denials for admission. For these same reasons, we deny Doe's cross-petition for admission.

---

[1] The petition and pleadings originally referred to the Respondent and Cross-petitioner by name. By order of this Court, on August 7, 2023, the case name was changed to *Idaho State Bar v. John Doe* to protect confidentiality in the sealed record. Thus, the alias "Doe" will be used throughout this opinion to refer to the Respondent.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Doe is 34 years old and a May 2019 graduate of Concordia University School of Law, in Boise, Idaho. In July 2019, he applied for admission to the Delaware State Bar Association after passing the Delaware Bar Examination. A passing score is a prerequisite in Delaware to apply for admission. Although Doe received a passing score on the exam, Delaware denied his application on character and fitness grounds.

Doe then applied to take the Idaho Bar Exam twice and was denied both times. The ISB cited character and fitness grounds as the basis for both denials. A little over a month after the second denial, Doe applied a third time, without showing any substantial change in circumstances.

Based on what the ISB contends to be a third successive filing that fails to address the fitness and character concerns raised by the Delaware Bar, the ISB filed a petition with this Court on May 3, 2023. The ISB asks this Court (1) for permission to summarily reject Doe's third successive application and (2) to prohibit Doe from filing further applications for the next five years, or until Doe demonstrates a significant change in his circumstances. The ISB cites the abusive nature of Doe's prior conduct in his two previous applications, as well as the considerable administrative costs it has incurred in processing and investigating Doe's successive applications. The ISB further alleges that over the last two years bar counsel has spent at least 50% of his time addressing Doe's prior applications and responding to three lawsuits in which Doe has named the ISB as a party.

Doe filed three lawsuits in the United States District Court for the District of Idaho against the ISB, the Board of Commissioners of the ISB ("the Board"), certain personnel of the ISB, and others, primarily raising constitutional and ADA claims. *[Doe] v. Idaho State Bar*, No. 1:22-cv-00090-REP (D. Idaho March 1, 2022) (hereinafter "*Doe I*"); *[Doe] v. Idaho State Bar,* No. 4:22-cv-00253-REP (D. Idaho  June 19, 2022) (hereinafter "*Doe II*"); *[Doe] v. Idaho State Bar*, No. 1:22-cv-00478-REP (D. Idaho Nov. 19, 2022) (hereinafter "*Doe III*"). He has also filed federal litigation in Delaware to raise constitutional challenges to certain attorney admission requirements of the Delaware Bar after being denied admission on character and fitness grounds. *[Doe] v. Seitz*, No. 1:21-CV-01637 (D. Del. Nov. 22, 2021).

2

The extensive history of this matter can best be understood by reviewing each of Doe's previous bar applications[2] in Delaware and Idaho.

### A. Doe's Delaware Application

Following Doe's graduation from Concordia Law School, he took and passed the Delaware Bar Examination in 2019. He subsequently applied for admission to practice law as a member of the Delaware State Bar Association. Doe's application initially contained multiple deficiencies, including, but not limited to: listed GPAs that did not match his official transcripts, inconsistent dates from his resume and law school application, and missing litigation documents that were required under the application's instructions. After Doe corrected the deficiencies, the Delaware Board of Bar Examiners commenced a character and fitness investigation and interviewed Doe as part of that process. The investigation revealed multiple instances of omitted records and disclosures. These omissions included the following: the suspension of Doe's security guard license; his participation in administrative hearings; various employment terminations and Doe's troubles maintaining steady employment; disciplinary incidents and behavioral problems at multiple educational institutions; and Doe's efforts to hide the fact that he "committed fraud" in claiming unemployment benefits while working a summer job. The investigation also reported a 2009 incident Doe had at a technical college in Delaware where, as part of a class practicing listening skills, he said, "I want to talk about how I think about hurting people. I can't stop thinking about ways to hurt people that have hurt me. I think about it so much that I can't sleep."

The Delaware Bar investigation's final recommendation on June 1, 2020, noted that "had [Doe] answered all the character and fitness questions correctly on his law school application, it should have caused significant pause concerning his admission to the law school." Delaware's Board of Bar Examiners then concluded that Doe "failed to carry [his] burden to establish the character and fitness requirements for admission to the Delaware Bar as set forth" in its rules under

---

[2] Pursuant to Idaho Rule of Evidence 201(c), we take judicial notice of the complete files in this Court's Docket Nos. 48541 and 49841, which relate to Doe's first two bar applications. These files include, but are not limited to, the following documents: the Board's Findings of Fact, Conclusions of Law, Decision and Order following the show cause hearing (Dec. 14, 2020); the Hearing Officer's Recommendation to the Board of Commissioners (Nov. 30, 2020); the show cause hearing transcripts (Sept. 16, 2020); the Findings of Fact, Conclusions of Law, and Recommendation filed under seal by the Character and Fitness Committee on Doe's first bar application (Jun. 20, 2020); the Findings of Fact, Conclusions of Law, and Order from the Board on Doe's first bar application (Jun. 24, 2020); Doe's 2019 Delaware Bar Application; the Delaware Board of Bar Examiner's decision to deny Doe admission to practice (Aug. 28, 2020); and Delaware's Character and Fitness Report, with exhibits (Jun. 1, 2020).

the Delaware Supreme Court. Of special concern to Delaware's Board was Doe's "lack of candor" throughout the application process.

**B. Doe's First Application to take the Idaho Bar Examination and Related Federal Lawsuit**

Doe filed an application with the ISB on February 29, 2020, to sit for the July 2020 Idaho Bar Examination, but was denied following the findings and recommendation of the ISB's Character and Fitness Committee ("the Committee"). In Idaho, an applicant seeking admission to the ISB is required to submit a complete application and fully disclose all information requested of him by the ISB and the Committee. I.B.C.R. 204. Where responses and materials in a bar application implicate eligibility criteria relating to character and fitness, the application may be referred to the Committee for a character and fitness examination. I.B.C.R. 208. The Committee shall then "[s]ubmit to the Board its findings of facts, conclusions of law and recommendation regarding any denial or conditional admission," I.B.C.R. 209(c)(5), which the Board may approve, deny, or modify; issue a recommendation of conditional admission; or request further investigation, I.B.C.R. 215(a).

In the case of Doe's application, the Committee recommended, and the Board agreed, that Doe failed to prove he was qualified for and entitled to admission to legal practice in Idaho under multiple eligibility requirements listed under Idaho Bar Commission Rules 201 and 210(a)(3). This was due in large part to Doe's application omitting information of past misconduct and misstating his history, as he had in his Delaware application. These events include, but are not limited to:

- Doe's failure to disclose to the ISB that the Delaware Board of Bar Examiners denied his bar application on character and fitness grounds.

- While employed by Delaware Animal Care and Control in 2011, Doe used the agency's access to a criminal justice database to perform unauthorized searches of individuals. This conduct resulted in his termination. Doe initially reported to the ISB that he was terminated due to "downsizing," but later explained that he had "cherry picked" the explanation that "portrayed him in the most favorable light."

- Doe was terminated from another job with a security company in 2012 after misusing company equipment and "inappropriately engaging a troublemaker by challenging him to 'meet up after work.' " Doe failed to disclose this termination.

- In 2015, Doe was terminated from his employment with the Delaware Office of Animal Welfare after an inappropriate interaction with a female coworker where, in his own words, Doe "made a sexual comment about 'blowing;' " and "made inappropriate commentary about another employee's sex life." Doe later filed a lawsuit against this employer for discrimination and retaliation.

4

- In 2015, Doe illegally collected unemployment benefits in Delaware while employed, by continuously reporting income "that was close to, but never exceeded the cap on earnings that would trigger a reduction in [Doe's] unemployment insurance benefits." He challenged the Delaware Department of Labor's determinations on this matter at each stage by personally "attacking the decision-maker," filing a civil rights action against the decision-maker "based upon the manner in which she treated him during the appeals hearing," and accusing a federal judge of "misstating evidence" to benefit the opposing party.

- When engaged in litigation against the Delaware Department of Labor's referee, Doe proceeded to have default entered against the referee even though he knew she had not been properly served. He later argued before the federal district court, the appellate circuit court, and in his petition for *en banc* review, that service was properly effectuated, repeating false statements to each tribunal.

- Doe initially failed to disclose that he had been a party to civil suits he filed against Delaware Animal Care and Control and the administrative proceedings concerning his unemployment benefits.

- Doe failed to disclose a 2014 incident in Delaware where he was disciplined at Wilmington University and placed on probation.

- Doe failed to disclose several informal investigations into his conduct by Concordia Law School between 2016 and 2019, including an incident of vandalism to his study carrel he committed by affixing a memorial plaque to the carrel outlining "highlights" of his academic career at Concordia and describing himself as "Concordia's Original Overzealous Objector." The plaque falsely listed several academic awards that Doe never received.

Ultimately, the Board concluded that Doe had failed to establish he was eligible for admission due to his inability to be honest and candid, to use good judgment, to conduct himself with respect for and in accordance with the law, and to avoid acts which exhibit disregard for the rights or welfare of others.

Pursuant to Idaho Bar Commission Rule 215(d), Doe challenged the Board's decision and was granted a show cause hearing. The Board appointed Senior Justice Joel Horton as the hearing officer. While Doe initially failed to disclose to the ISB that he had been denied admission in Delaware, the record developed over the course of his character and fitness investigations in Idaho and Delaware, as well as the Committee and the Board's prior decisions, were considered by the hearing officer. Following the hearing, the hearing officer recommended to the Board that Doe had failed to prove he was qualified for admission to the bar. The Board agreed and denied Doe's application, articulating its findings and conclusions in a written order.

In addition to the concerning information from Doe's past that he failed to disclose, the hearing officer found, and the Board agreed, that Doe's current conduct exhibited a "pattern of

concealment and/or minimization of information that adversely reflects upon his suitability for admission to the practice of law." The hearing officer found that Doe took "a very narrow view of his duty to disclose information relating to investigations," and Doe's "actions to conceal conduct directly relating to his character and fitness to practice . . . is deeply troubling." In reaching these findings, the hearing officer explained that Doe often excused his past misconduct and failed to take accountability for his actions. For instance, Doe would make attempts to "be 'funny' " to justify incidents of vandalism to his study carrel at the law school. He also tried repeatedly to excuse his fraudulent collection of unemployment benefits in Delaware as a "simple mistake."

Of particular concern to the hearing officer were Doe's tendencies for "dogged pursuit" and "[t]ilting at windmills" as he used litigation in a vindictive fashion. One key instance was Doe's history in the "Ferguson litigation." Back in Delaware, Doe pursued frivolous litigation to enforce a default against an administrative law judge, Bettina Ferguson, despite knowing that notice had not been properly served on her. Ferguson was targeted because she presided over Doe's unemployment proceedings where it was determined that he fraudulently obtained benefits while employed in a summer job. Even after Ferguson succeeded in her motion to set aside the default for defective service, Doe continued to argue on each appellate level that service had been proper. "In the course of doing so, [Doe] filed an affidavit that represented that he would not have paid his process server's fees if he had believed the service to have been improper." Then, in his appeals, Doe attacked the integrity of the federal judge, falsely accusing him of "admitting" to abandoning his impartial role in order to aid Ferguson. Doe "accused the federal district judge of 'misstating the evidence set forth in the record to benefit Ferguson.' " (Emphasis omitted).

In addition to this frivolous litigation, Doe filed a complaint with Delaware's attorney discipline authorities (the Office of Disciplinary Counsel, "ODC") against his then-attorney, John Brady. The complaint was dismissed by ODC attorney Jennifer Aaronson, who "found that the complaint did not warrant discipline." In response, Doe then filed a disciplinary complaint against Aaronson. Doe later summarized his own actions:

> when then ODC Counsel Jennifer-Kate Aaronson was kind enough to call me—as a courtesy—to tell me why she was dismissing the complaint against Mr. Brady, I became very hostile to her, told her she was lazy, corrupt, and incompetent, and then hung up on her. I then proceeded to file an ODC complaint against her because I did not agree with the statements she made to the court.

Finally, the hearing officer concluded that Doe pursued frivolous litigation against his employer, the Delaware Office of Animal Welfare, for discrimination and retaliation after Doe

6

was terminated for inappropriate interactions with a female coworker. Based on Doe's personal litigation history, the hearing officer summarized Doe's behavior in past litigation as exhibiting a "pattern of demonizing those who make decisions adverse to his interests. He ascribes improper motivations, ethical lapses, and ineptitude to such individuals."

After the Board denied his first application, Doe filed a petition for review with this Court pursuant to Idaho Bar Commission Rule 215(g). We affirmed the Board's denial of Doe's application on February 4, 2022, explaining that Doe failed to demonstrate the ability: (1) to be honest and candid with clients, lawyers, courts, the Board and others; (2) to avoid acts which exhibit disregard for the rights or welfare of others; and (3) to comply with the requirements of the Idaho Rules of Professional Conduct, applicable state, local, and federal law, regulations, statutes and any applicable order of a court or tribunal. This Court affirmed the Board's conclusion that Doe's failure to meet these essential eligibility requirements, coupled with his conduct and failure to fully disclose all the information requested of him, disqualified Doe from admission to the Idaho State Bar on character and fitness grounds.

About a month later, Doe filed a lawsuit in the United States District Court for the District of Idaho against the ISB, then ISB President Kurt Holzer, Character and Fitness Committee Chair Matthew K. Wilde, and ISB Associate Director Maureen R. Braley. Doe argued that he suffers from disabilities, that Idaho Bar Commission Rule 210(a)(3)(H) and (I) unlawfully bar eligibility for legal practice based on disability, and that the ISB and other defendants engaged in discriminatory conduct against him. Doe also explained that he was diagnosed as a teenager with Obsessive Compulsive Disorder ("OCD"), Attention Deficit Hyperactivity Disorder ("ADHD"), and a functional form of autism known as Asperger's Syndrome. In his complaint filed in federal court, Doe stated:

> In recent years, the area of attorney licensing has become a cesspool for unlawful discrimination under the ADA where politically unaccountable decisionmakers – usually groups comprised of professionally unsuccessful lawyers – sit on their imaginary throne of dictatorship like a czar as they stigmatize, devaluate, and unnecessarily burden unqualified applicants (who are also their prospective competitors) on the basis of an actual or perceived disability.

Doe also made false personal attacks against Wilde and Braley, stating:

> Matthew K. Wilde . . . has been practicing law for over two (2) decades and has never won a single case in his entire career. In fairness, he was only ever docketed for one case, but the ironic thing is that he lost and his filings before the Idaho

Supreme Court were so lacking in merit that he was made to pay the opposing sides [sic] legal fees.

. . . .

Similarly, Ms. Braley was someone who struggled immensely in her legal career before slithering into the Idaho State Bar. Ms. Braley had very short lived careers in both the public and private sectors before being given the opportunity to regulate our profession. From the few pleadings Plaintiff has been able to track down from Braley's short-lived career, it was apparent that the pleadings were in no way indicative of any kind of legal talent. In fact, the pleadings read by Plaintiff would not survive a law school civil procedure class.

Doe presented no evidence to support any of these assertions.

The United States District Court ultimately granted the defendants' motion to dismiss the action because it lacked jurisdiction over Doe's claims. *Doe I*, 643 F. Supp. 1093, 1110 (2022). The court concluded that Doe's requested relief would have violated the *Rooker-Feldman* doctrine[3] because it would require a finding that the decision denying his first bar application was unlawful, thus making it a de facto appeal before the federal district court. *Id.* Additionally, the district court explained that Doe's complaint must be dismissed because the claims did not establish a plausible basis for relief under the high standard of facial challenges under the ADA, the Rehabilitation Act of 1973, or the Fourteenth Amendment. *Id.* at 1115–21.

## C. Doe's Second Application to take the Idaho Bar Examination and Related Federal Lawsuit

On April 11, 2022, Doe filed a second application with the ISB to take the July 2022 Idaho Bar Exam. He emailed Holzer, Wilde, Braley, and others at the ISB to notify them of this fact under the subject line, "[Doe] Bar Application (The Second Coming)." In his email, Doe demanded "that only certain information from his First Application be considered with his Second Application," "that the ISB communicate with him regarding his Second Application according to his terms," and that the Board "issue a decision within 30 days of his submission of the Second Application."

The Committee voted unanimously to defer his application to the February 2023 Bar Exam in order to conduct a second character and fitness examination under Idaho Bar Commission Rule

---

[3] The *Rooker-Feldman* doctrine prohibits "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Its name is derived from two United States Supreme Court cases: *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923), and *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

208. "This was done to allow sufficient time to schedule and complete the [Rule 208] examination, prepare the transcript from the examination, and allow the [Character and Fitness] Committee sufficient time to evaluate the information."

Upset that the Rule 208 examination would not be completed before the July 2022 examination, Doe sent an email to the ISB's Bar Counsel,[4] stating:

> Well guess what boys, the games stop here. I am bringing this to an end as I am tired of being dicked around. **YOU GUYS ARE IN THE WRONG!** You can[']t do what you are doing, bar applicants have the same liberty interests as those already licensed and I have had to sit in the penalty box for three (3) years watching you guys bottle feed and bootlick lawyers who are some absolute trash.
>
> Therefore, on Monday, June 20, 2022, my best friend Jason (an Idaho lawyer) and I are going to the Idaho Federal Court and are going to seek an emergency TRO [temporary restraining order] under the *Gershenfeld* [641 F. Supp. 1419 (E.D. Pa. 1986)] case. I am not putting up with more and more needless delay. . . . If I do not hear from you this weekend, it will be conclusively established that the ISB consents to the entry of a TRO and does not contest such temporary order. If [the] ISB *does* contest it, then you are asked to call or text me this weekend to work out a lawful resolution. Otherwise, the ISB will waive any argument that it contests the entry of a TRO. . . .

(Emphasis in original). Two days later, Doe emailed the Board, ISB Executive Director Diane Minnich, Bar Counsel, Wilde, Braley, and several others, stating:

> Hello Idaho State Bar,
>
> It[']s just little ole me again, [Doe], the ISB's favorite bar applicant coming to grace you with my demigod presence once again. I hate how we always have to have these types of contentious interactions but you guys do this stuff to yourselves, although I am sure you take no responsibility for your own actions and seek to somehow put the blame on me. I remind you that on April 11, 2022, I did what most lawyers *would not* do by providing you with the thoughtful notice of specific procedural due process requirements and the golden case I would proceed under should those requirements not be followed (*Gershenfeld*). How do you guys repay my overwhelming kindness? You spit in my face and laugh while you are doing it.
>
> The Lord Jesus has blessed me with a legal mind so sophisticated and profound that I recognize it to be a gift on mere loan to me during this vapor of a lifetime. That said, I plan to always use my talents in ways that glorify Him and I find that fighting the corruption rampant within your organization is one such task.
>
> Again, I hate that we have to have these types of contentious relations but, respectfully, you guys will not simply follow the damn law and you always try to inflict irreparable harm against me, needlessly. You use unethical tactics to try and

---

[4] "Bar Counsel" refers to the position of disciplinary counsel for the ISB. During the events giving rise to this matter, the position was initially held by Bradley G. Andrews. It is currently held by Joseph Pirtle.

deprive me of the thing most important to me in life surpassed only by Jesus and my loved ones. As a result, I am forced to try and bring you to justice using lawful and ethical means.

Doe then filed a second federal action against the ISB, Holzer, Wilde, and Bar Counsel for declaratory and injunctive relief. The action was later dismissed, on Doe's motion, when Doe petitioned this Court to extend the deadline for transferring his Multistate Bar Exam ("MBE") score from Delaware under Idaho Bar Commission Rule 217(d). This Court granted Doe's motion to extend the time to transfer his MBE score. The United States District Court later declined Doe's request to issue findings as part of the dismissal.

Soon after, on August 22, 2022, Doe appeared for a "Rule 208 examination" by Bar Counsel and members of the Committee. The examination took place at the Idaho Supreme Court building in Boise, Idaho. Doe contacted Bar Counsel beforehand and offered to have "Pizza or Chipotle or Chic Fil A" and "some alcoholic beverages" delivered to the courthouse "for the panel . . . and all those involved . . . ." The Committee declined his offer.

The Rule 208 examination commenced with opening statements from Doe, who explained to the Committee that he specializes in the area of bar admissions—calling himself "America's leading expert" in this area. He explained the history of bar admission policies in the United States and shared his views on the meaning of "good moral character" and "moral turpitude" in the context of bar admissions. Doe stated his belief that he had "done everything that a practitioner, someone who is practicing law, has done to earn the privilege of practicing law, other than passing this state's exam, of course, which [he is] trying to earn the right to do."

Doe also discussed a period of illness he experienced during his Delaware Bar Exam preparations in 2019. Despite having "no evidence at all," Doe made the assertion that the illness was a result of the Delaware State Bar poisoning him with "Yellow Rain," a biological weapon, which "the Soviets did to kill people." Doe noted for the Committee that when "[y]ou've got one guy coming to disrupt the whole system and how they do things[,] [i]t's awfully convenient if they die without, nobody, you know, it's never figured out . . . ."

At the examination, the Committee questioned Doe about matters pertaining to his inability to be candid and his inclination to be dishonest. The Committee referred to the findings of hearing officer Justice Horton, as adopted by the Board, in Doe's first bar application, which collectively demonstrated Doe's tendency to minimalize and conceal adverse information. They cited numerous instances where Doe made misstatements or omissions in his bar applications.

10

The Committee asked Doe what he had done since February 4, 2022, to address this Court's conclusion that Doe failed to meet the eligibility requirements to practice law in Idaho regarding his honesty and ability to be candid. Doe explained that the incidents of concern were disclosed in his second application, and assured the Committee that there were no omissions this time. As for Doe fraudulently obtaining unemployment benefits in Delaware, Doe explained that he collected unemployment payments each week while employed in a summer job because he "didn't want to be bothered," and just "guessed random numbers" because he did not understand how to correctly report his pay periods. In hindsight, Doe noted, he would have sought an explanation, gotten off unemployment, "or I would have just not reported it." He explained:

> I was on unemployment; I got a summer job; I told the unemployment office that I had a new, a new summer employment; they said that's great; report your income, and then at the end of the summer give us your pay stubs.
>
> I didn't understand how to report it correctly because the pay periods ran differently. It was my responsibility to go in there and figure it out. Instead I just, I didn't want to be bothered with my summer, so I just guessed random numbers in there, the same number, I think, the whole summer, and said, well, I'm going to give them my pay stubs at the end of the summer so they will, they will tell me if there's a problem.
>
> Well, they did tell me that there was a problem. In fact, I had to pay it all back, and I did pay it all back. And I learned a valuable lesson with that. And I should have known better because at that point I had completed a financial fraud information course in my undergrad, and I still just decided to guess random numbers in there. And I was wrong for doing it. And that was dishonest because I knew, I knew that the numbers weren't right but I didn't feel like figuring it out, and it was too much hassle to me, and I was having too much fun working a summer job.
>
> So if I could go back now I would have just told them -- I would have either gone in there and told them I don't understand, or I would have just not reported it, or just gotten off the unemployment altogether.

The next category the Committee addressed was its prior finding that Doe "failed to meet his burden of proving that he possesses the ability to avoid acts which exhibit disregard for the rights or welfare of others." In particular, the Committee addressed how the hearing officer had previously found that Doe "has a history of using litigation and bar disciplinary proceedings in a vindictive fashion." The Committee also asked Doe whether this was a fair assessment of Doe's conduct at the time of the first application. Doe said it was not. Doe also disagreed with the Committee that Doe's subsequent litigation since 2022 demonstrated vindictive behavior. Doe explained:

11

> But all I'm trying to [do] is change the facial text of that rule so that way people aren't [sic] like me who are talented and passionate, who would never do something that is unethical aren't held out of their calling just because of some of the things that they've had to overcome in their life.

Yet in the context of his frivolous lawsuit against Aaronson, Doe conceded that he has previously filed claims for vindictive and wrong reasons:

> I mean, I admit, even at this time like the stuff against [Aaronson] was filed, what I will concede to you is I did have a tendency to go after people like that and do vindictive stuff, and the one against [Aaronson] was that. It was frivolous.
>
> . . . .
>
> It doesn't mean what I was saying was right. My stuff was done for the wrong reasons. I was, I just, you know, I didn't like the way she treated him, and so I filed it to try and stick it to her, and it was wrong.

During the course of the Rule 208 Examination, many of the Committee's questions focused on Doe's interactions with others, particularly those concerning personal boundaries and his ability to avoid acts which exhibited disregard for the rights or welfare of others. These questions touched on several incidents of troubling conduct and statements. For example, while Doe attended a technical college in Delaware, a professor reported that she felt threatened by Doe and unsafe after an encounter with Doe in class. Doe introduced himself to the class as a former state police officer, even though Doe was never a police officer. He then discussed the number of arrests he made in his career, and told the professor he could arrest her and "take her dog" for failure to properly license the dog. Doe told the Committee that he never meant to threaten anyone, but was just trying to express a different and generalized view of when officers should issue tickets. He added that the professor "was probably more offended that somebody challenged the methodology she was teaching . . . ."

The Committee also asked Doe to provide context for his termination from the Delaware Office of Animal Control in 2015 after an inappropriate interaction with a female coworker. Doe referenced the answer given in his amended ISB application, explaining that he was terminated after he

> (1) made a sexual comment about "blowing;" (2) they said that the phrase "bend over backwards" indicates a sexual position which was a sexual comment (notwithstanding the fact that this is impossible because if a male tried to maintain a firm erection bent over backwards he would likely strain his pudendal nerve); and (3) I made inappropriate commentary about another employee's sex life.

Doe told the Committee: "what I said was inappropriate. It's not ever appropriate. But she was pretty crude. She was pretty crude. So I don't think it really upset her that much."

The Committee also discussed a concerning incident when Doe counseled a troubled young woman, a fellow law student at Concordia whom he tutored, after discovering she had a history of traumatic sexual abuse. Doe discussed the student's sexual history with her at various times and counseled this student to obtain a "nutraceutical" from her physician. Doe made this recommendation based on his personal research on neurobiology, which he described as a "hobby" of his, and later explained that he believed this had a positive effect on the student. When asked whether he thought he exercised appropriate boundaries in this tutor-student relationship, Doe stated: "at the time I didn't know her that well. So I think initially it was probably a little premature to delve into somebody's mind like that." When asked about how he would act as an attorney with people in vulnerable situations, Doe said: "If I can use my talents to help others, I'm going to do it. I understand [the] point. You know, there's a point in time where it's appropriate social boundaries, but I was able to help that woman."

When the Committee asked Doe about his derogatory statements regarding specific ISB personnel—by falsely summarizing their legal practices and attacking their lack of "legal talent" in his filings—Doe explained that he sees his statements as "facts" rather than opinions or personal attacks. On learning that he made false statements about Matt Wilde's practice history, Doe stated he would file a notice of errata to correct factually incorrect statements "[b]ecause I owe that duty of candor to the court." Later, in his closing statement, Doe cited *Konigsberg v. State Bar of California*, 353 U.S. 252, 269 (1957), to state: "citizens, even Bar applicants, have the right to criticize courts and court regulatory bodies. They are not immune to such criticism." The Committee also noted the high frequency of long, angry, late night emails Doe sent to them and the Board, to which he explained that he "work[s] 9:00 to 5:00 jobs." Doe also admitted that at least one email was sent because "I was really pissed off at you guys."

The Committee next addressed Doe's inability to comply with rules and past violations of reasonable rules of conduct. The Committee focused on the finding that Doe pursued frivolous litigation against a Delaware Department of Labor referee, and filed an affidavit containing false statements to a tribunal concerning service of process. In that litigation, Doe specifically claimed that service was proper when he knew it was not, and pursued an entry of default against the referee. In that same litigation, Doe also implicated Idaho Rule of Professional Conduct 8.2 by

making "a statement [he knew] to be false or with reckless disregard" regarding the qualifications or integrity of a judge. The hearing officer determined that Doe's conduct in the civil proceedings was "substantial probative evidence" of Doe's inclination to violate reasonable rules of conduct. Doe told the Committee, "I think that I've learned from past mistakes in that regard."

Following the examination, the Committee voted unanimously to deny Doe's second application. The Committee informed Doe of its decision by telephone and began drafting its findings of fact and conclusions of law in order to issue a recommendation to the Board pursuant to Idaho Bar Commission Rules 209(c) and 215(a). However, the Committee's phone call to notify Doe prompted him to immediately email the Board. Doe told the Board that he was "the top bar admissions expert in America," and that he requested a "special meeting" to render a prompt decision on his second application. Doe told the Board of his frustrations with the delay taken to consider his second application, and asserted that further delay was "improper, unconstitutional, undertaken in bad faith, and needless." Doe also informed the Board that he had "already reached out to Justice Horton and he [was] willing and able to preside over a second show cause hearing if the need arises," offering Justice Horton's availability for an October or November meeting, and stating he was willing to personally pay Justice Horton $507.36 daily for his work as a hearing officer. While Doe had reached out to Justice Horton by email, Justice Horton later informed the Board that he told Doe that he was not available and that Doe's communications were becoming inappropriate.

A series of emails between Doe, Justice Horton, the Board, and Bar Counsel followed over the next 24 hours. As recounted in the Board's findings:

> Justice Horton responded that he cannot help, that the selection of a hearing officer is up to the ISB, and that due to personal matters he would likely be unavailable for such a hearing until March or so. [Doe] replied to Justice Horton offering to pay the costs for Justice Horton to serve as a hearing officer, and asked if he could state in a motion that Justice Horton is available to serve in October and November in a limited hour capacity. [Doe] also stated that he has "a passion for helping people overcome chronic sickness and rare maladies" and invited Justice Horton to share his circumstances to see if [Doe] can help him. Justice Horton replied by email the morning of October 14, 2022, and copied Bar Counsel on the email. Justice Horton indicated that he was unwilling to accept payment from a party to perform senior judge duties. He also declined [Doe's] offer for assistance and indicated that he did not think it is appropriate to develop friendships with a potential party. Justice Horton also indicated that he copied Bar Counsel on the email to eliminate any concerns regarding ex parte communications. . . . [Doe] sent a follow up email

14

thanking Justice Horton for his willingness to preside over [Doe's] second show cause hearing.

After Bar Counsel clarified factual statements made by Doe and explained that a show cause hearing would be premature—as no decision had issued yet from the Board under Rule 215—Justice Horton sent a final email ceasing his involvement on any matter involving Doe.

> There will be no need for further communication with me on this subject, scheduling or otherwise. I do not wish to play any role in any matter involving Mr. [Doe]. Indeed, I see no need for further communication with Mr. [Doe] on any subject.

Doe then emailed Bar Counsel with the message, "Nice work Joe, you scared away Justice Horton; the fairest hearing officer we could have asked for. Lol but I forgive you."

More emails continued from Doe that day as he accused the Board of abusing its regulatory powers by causing delays in processing his application, and he requested a special, urgent meeting. The Board informed Doe it could not render a decision because it had not yet received the Committee's decision. Doe warned the Board that he would spend the weekend drafting "one of the most extensive and comprehensive federal lawsuits ever to be filed," and then offered a compromise: they could settle this proposed lawsuit in exchange for a joint petition to the Idaho Supreme Court for a special writ that included (1) ISB's admission of fault in making an admissions decision that was based, at least in part, in retaliation against Doe for the federal lawsuit; and (2) ISB's admission that it violated Doe's due process rights. If this offer remained unaccepted, Doe advised, he would proceed with filing a new lawsuit in federal court.

While waiting for the Committee to issue its findings and recommendation, Doe sent another email to Bar Counsel, the Board's Commissioners, and others to express he was "deeply troubled" that the Board would not consider his second application at its upcoming meeting on November 9, 2022. The Bar asserts that not only were these direct communications with the Board a violation of the Idaho Rules of Professional Conduct, I.B.C.R. 201(g), but they also contained information that was inconsistent with the record. This includes the false allegation that the Board promised to consider Doe's application at its November 9 meeting. Doe stated:

> If this unconstitutional delay does not stop, and a decision is not rendered tomorrow as promised on October 14, 2022, I swear to Jesus Christ of Nazareth that I will pursue you to the fullest extent that our system of justice, or ethical rules, and our Heavenly Father allow me. You guys may possess earthly power from *this* world, maybe even substantial wealth, but I serve Jesus Christ and He is not impressed by the empire man has built. If He allows me, I will use my legal talents to "bring down the walls of Jericho" through legal means. You guys might be

backed by the most powerful forces of man, such as the Office of the Attorney General, but I serve a God that is not moved by the power of man, and if He wants me to prevail there is not a force on this earth that will impede His plan. I recognize that my exceptional legal talents are a mere gift on loan to me during this vapor of a lifetime. Jesus restored my life and ability so I could take on the greatest and most evil force this Nation has ever seen, the Delaware Bar and their army of nine (9) different lawyers, and that same restoration allowed me to bring the legal challenge against the ISB that is apparently uncovering a network of unprecedented corruption, as shown by the fact that we are even faced with this situation here today.

On the same day, Doe also emailed the Idaho Attorney General, and others, to repeat allegations that he had been promised his application would be considered at the November 9 meeting, and requested that the attorney general initiate an investigation into the ISB's activities. He stated: "I also want to discuss opening an investigation into this agency of the State that is intentionally abusing its regulatory authority and I am a citizen of this great State. Can you guys PLEASE get involved???" In another email to Bar Counsel, Doe wrote: "I could not have imagined the ISB would needlessly impose a three (3) month delay, especially after how well that Rule 208 Exam went."

About this same time, Doe's federal action in Delaware was dismissed without prejudice by the United States District Court for the District of Delaware. *[Doe] v. Seitz*, 2022 WL 16852613 (D. Del. Nov. 10, 2022). Doe filed a supplemental motion for reconsideration alongside a motion for recusal, heatedly criticizing the district court's decision to dismiss his action and accusing Chief Judge Freda L. Wolfson of bias, bribes, and other ethical violations. Doe's statements in the motions filed in his Delaware case included:

- "Judge Wolfson's written opinion would not survive a law school civil procedure class."

- "[Judge Wolfson] and her husband, Douglas Wolfson (a former state court judge), **were previously busted** by ethics organizations for (according to them) accepting **kickbacks** from prominent defendants then-appearing before Douglas Wolfson's court!" (Emphasis in original).

- "[Doe] does not in any way insinuate that Judge Wolfson is currently accepting kickbacks even if she was found/alleged to have done so in the past. [Doe] merely states <u>why</u> he initially <u>felt a certain</u> way and <u>fully discloses the facts supporting the feeling</u>, and these statements are thus immune from professional recourse pursuant to the First Amendment." (Emphasis in original).

- "The world will forever see the unfounded—and completely false—'jabs' Judge Wolfson made against [Doe] in the MD&O, as it was published for the world to

16

see. Unfortunately, due to the brokenness of our system, the world will never know the backstory; that these statements were made by someone who was deceitfully posing as a neutral decision maker but who was in all actuality a self-interested defendant . . . Yet, even if she is disqualified, Judge Wolfson will scurry away unhindered collecting that fat pension (and perhaps other cozy kickbacks if what the organizational reports allege are true) while [Doe's] name and employability is forever tarnished, wrongfully. [Doe] is just starting his legal career and he had every right to bring his case and have it decided by a neutral decisionmaker. Unfortunately, that did not happen."

The Delaware federal district court ultimately denied Doe's motion for reconsideration but permitted Doe to raise his "misunderstood" arguments in a third amended complaint. *Seitz*, 2023 WL 6387921, at *1 (D. Del. Sept. 29, 2023). Doe's "third bite at the apple" proved to "be his last" as Doe again failed to establish Article III standing for his alleged, and "speculative," injuries. *Id.* at *1, *6–8.

At the same time as the Committee was preparing its recommendation to the Board following the Rule 208 Examination, Doe was employed in a judicial clerkship with the Honorable Mitchell W. Brown in Caribou County. It is unclear from the record whether Judge Brown was aware of Doe's previously denied bar applications when he hired Doe. However, sometime between November 9 and 14, 2022, Judge Brown "received information that [Doe had] made a perceived threat to personnel" with the ISB and Bar Counsel at a Bar "Road Show" meeting in Pocatello, and that Doe had represented himself as being Judge Brown's staff attorney "for personal litigation purposes." Judge Brown then placed Doe on paid administrative leave and terminated him a short time later.

A few days later, on November 19, 2022, Doe initiated his third Idaho federal action before the United States District Court for the District of Idaho, seeking a preliminary injunction to order the defendants to issue a decision on his second application and arguing that specific Idaho Bar Commission Rules are unconstitutional. He also argued claims of unconstitutional and retaliatory employment termination, and conspiracy to commit the unconstitutional and retaliatory employment termination. The defendants in the third federal action included Judge Brown, Caribou County, Bear Lake County, Franklin County, and Bannock County.[5] Doe maintains, and

---

[5] In this third federal action, the district court denied Doe's request for a preliminary injunction and dismissed some claims and defendants where Doe's complaint lacked "clarity." *Doe III*, 2023 WL 3394925, at *5 (D. Idaho May 11, 2023); *Doe III*, 2023 WL 3390041, at *2 (D. Idaho May 11, 2023); *Doe III*, 647 F. Supp. 3d 943, 957 (2022) (citing *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017)). Doe then filed a motion to voluntarily dismiss the surviving federal claims "so that he [could] raise his federal claims before the Idaho Supreme Court." He filed a motion with this Court to submit the new arguments, but then "abandon[ed] this effort" in order "to move this

stated in federal court, that the ISB made a false report to Judge Brown that wrongfully resulted in his termination. He also claims that his email—the one swearing to "pursue [the ISB] to the fullest extent that our system of justice, or ethical rules, and our Heavenly Father allow [him]"—was misinterpreted as a threat and resulted in his termination.

On December 5, 2022, the Committee issued its findings of fact and conclusions of law, with a recommendation to deny Doe's second application. Pursuant to Idaho Bar Commission Rule 215(a), the Board considered the Committee's materials and recommendation, and voted unanimously to deny Doe's second application. The Board concluded that Doe failed to satisfy his burden of proving he met several essential eligibility requirements to practice law, including:

> 1) the ability to be honest and candid with clients, lawyers, courts, the Board and others under I.B.C.R. 201(a);
>
> 2) the ability to use good judgment on behalf of clients and in conducting one's professional business under I.B.C.R. 201(d);
>
> 3) the ability to avoid acts which exhibit disregard for the rights or welfare of others under I.B.C.R. 201(f); and
>
> 4) the ability to comply with the requirements of the Idaho Rules of Professional Conduct, applicable state, local and federal laws, regulations, statutes and any applicable order of court or tribunal under I.B.C.R. 201(g).

The Board found that Doe's failure to establish he met several essential eligibility requirements disqualified him under I.B.C.R. 210(a)(4). The Board found that Doe should be disqualified from taking the Idaho Bar Examination for exhibiting an inclination to be dishonest, violating reasonable rules of conduct, and failing to exercise substantial self-control.

In its findings, the Board noted numerous statements made by Doe in emails, litigation filings, and other documents that were of special concern to it. These statements were often made without supporting facts and citations, and demonstrated an inability to be honest and candid. One example cited by the Board was Doe's tendency to draft summaries and transcripts of proceedings and conversations from his own memory—without supporting documentation—including the alleged encounter Doe had with Judge Brown at the time his judicial clerkship was terminated. Doe's anecdotal transcripts contained self-serving admissions by others intended to support his positions:

> **[Doe]:** So everything in this letter is a pretext right? I mean, you wanted me gone regardless because I sued the State Bar and you weren't comfortable with that, and

---

case along and to avoid further delay." The federal court recently denied both the ISB's and Doe's motions for attorney fees on January 9, 2024. *Doe III*, 2024 WL 98434 (D. Idaho Jan. 9, 2024).

you wanted no parts of me because I sued them and I am battling against them in federal court? Correct?

**Judge Brown:** I admit it.

**Kerry Hong:** *gasp

Doe made no attempt to present evidence that his ersatz transcripts were accurate or truthful. As Doe acknowledged in his third federal lawsuit, portions of his complaint "read kind of like a movie script."

Ultimately, "[Doe's] ability to be honest and candid under I.B.C.R. 201(a) was the greatest concern for the Board." The Board explained:

> [Doe's] conduct relevant to honesty and candidness under I.B.C.R. 201(a) included misstatements and omissions in his First Application; a pattern of pervasive minimization and concealment of adverse information; a narrow view of what information must be disclosed; ignoring language in the character and fitness questions on the First Application; and continued false statements regarding fraud in obtaining unemployment benefits.

The Board was similarly concerned with Doe's "pursuit of non-meritorious claims in litigation, [his] use of bar discipline proceedings in a vindictive fashion, and [his] pattern of demonizing those who make decisions adverse to his interests."

Doe challenged the Board's decision to deny his second application and requested an expedited show cause hearing. This was done in accordance with Idaho Bar Commission Rule 215(d). The Board referred the matter to the Office of Administrative Hearings, which appointed attorney Leslie M. Hayes to serve as the hearing officer for Doe's second show cause hearing. Doe also filed a highly irregular request with Chief Justice Bevan of the Idaho Supreme Court to directly review the Board's order and oversee the processing of his second application, a request this Court denied.

Before the show cause hearing could take place, Doe filed a "motion to dismiss the complaint" with prejudice—arguing that the Board's order denying his application was a "complaint" under the Idaho Rules of Administrative Procedure and that it failed to either state a claim for relief or satisfy procedural due process. He further argued that the Board's order must be dismissed under the doctrine of res judicata. Doe also filed an "Omnibus Motion in Limine" seeking to exclude the ISB's witnesses for the show cause hearing. The hearing officer denied Doe's motion to dismiss, "but reserved ruling on [Doe's] argument that his conduct was protected

by the First Amendment." She also found that the 2022 Board Order complied with the Due Process Clause and that res judicata was inapplicable.

A week before the show cause hearing, Doe filed a notice withdrawing his request for the proceeding because he planned to have his present fitness reevaluated when he applied for the July 2023 Idaho Bar Examination. The hearing officer entered an order vacating the show cause hearing and closing the matter. As a result of Doe's withdrawal of his petition for a show cause hearing, the Board's order denying Doe's second application became final on March 7, 2023, pursuant to Idaho Bar Commission Rule 215(b).

### D. Doe's Third Application to take the Idaho Bar Examination

On April 12, 2023, just 36 days after his second application was denied, Doe submitted his third application to the ISB to sit for the July 2023 Idaho Bar Examination. Attached to Doe's application were certificates evidencing that he had obtained four Continuing Legal Education ("CLE") credits from attending teleconferences on ethics and professionalism. Doe also submitted a letter to the ISB that argued his second application was wrongfully denied "but that he has obtained an attorney mentor and that his participation in the ethics and professionalism CLEs demonstrates his rehabilitation."

On May 3, 2023, the ISB filed a petition with this Court seeking an order (1) permitting the ISB to reject Doe's current (third) bar application and (2) prohibiting Doe from filing future bar applications for a five-year period of time. As to the latter requested relief, the ISB asked this Court to enter an order either:

> 1. Prohibiting [Doe] from submitting any application for admission to the ISB for a period of five (5) years from March 7, 2023 – the date the 2022 Board Order became final following [Doe's] withdrawal of his petition for a show cause hearing pursuant to Idaho Bar Commission Rule ("I.B.C.R.") 215(d) following the denial of his 2022 application to the ISB; or
>
> 2. Prohibiting [Doe] from submitting any application for admission to the ISB without first obtaining written permission from the Court upon a showing of a significant change in his circumstances.

Doe filed a cross-petition, asking this Court for immediate admission to the bar by virtue of his Delaware Bar Exam score and his statements during the Rule 208 hearing. This Court scheduled a hearing on December 11, 2023, and afforded both the ISB and Doe an opportunity to be heard, after which we took the matter under advisement.

### II. THE IDAHO SUPREME COURT'S JURISDICTION AND INHERENT AUTHORITY OVER BAR MATTERS

The petition before this Court is unique. Generally, admission matters proceed to this Court on appellate review following a determination of the Board pursuant to Idaho Bar Commission Rule 216, which provides: "Following a show cause hearing, an Applicant may petition for Supreme Court review of the denial of an Application or Request, modification of an Application or Request, or a conditional admission recommendation." I.B.C.R. 216(a) and (b). This Court then reviews the applicant's petition under the arbitrary and capricious standard of review. *Id. See also Dexter v. Idaho State Bar Bd. of Comm'rs*, 116 Idaho 790, 792, 780 P.2d 112, 114 (1989).

Here, however, the ISB has filed an original petition with this Court seeking (1) an order permitting it to reject Doe's third bar application without processing it, and (2) an order prohibiting Doe from filing another application for five years. Thus, there is no underlying decision to review. The ISB's previous decisions denying Doe's first and second applications are final, while the current application has yet to be processed. Doe has cross-petitioned this Court to review the Rule 208 Character and Fitness Examination Transcript from his second application de novo and find him immediately eligible for admission and practice on the basis of both the transcript and his Delaware UBE score.

While the Idaho Bar Commission Rules do not contain specific provisions for this type of petition, cross-petition, or any of the requested remedies, this Court has broad and inherent constitutional power to regulate the practice of law in Idaho. *In re Malmin*, 126 Idaho 1024, 1028–29, 895 P.2d 1217, 1221–22 (1995). This is an authority both parties have expressly recognized in their briefing in asking this Court to use its jurisdiction to provide their requested relief.

"Since territorial days, the regulation of the practice of law in Idaho has been the province of the judiciary." *Id.* This power carried over from Idaho's Territorial Supreme Court and has been exercised by this Court as a judicial function since statehood. *Id.* at 1029, 895 P.2d at 1222. As the state's highest judicial authority, the Idaho Supreme Court has inherent power under the Idaho Constitution to control the Bar, govern attorney admissions, discipline practitioners, and regulate the practice of law. *Idaho State Bar Ass'n v. Idaho Pub. Utils. Comm'n*, 102 Idaho 672, 675, 637 P.2d 1168, 1171 (1981) (citations omitted). This power derives from three key sections of the Idaho Constitution: Article 2, section 1; Article 5, section 2; and Article 5, section 13. Respectively, these constitutional provisions establish the three branches of government and the separation of powers among them (Art. 2, § 1); the judicial powers of the state, which are vested in the "Supreme Court, district courts, and such other courts inferior to the Supreme Court as

21

established by the legislature" constituting "a unified and integrated judicial system" (Art. 5, § 2); and the constitutional mandate that the "legislature shall have no power to deprive the judicial department of any power or jurisdiction which rightly pertains to it as a coordinate department of the government." (Art. 5. § 13). Combined, these provisions have provided the foundation for this Court's inherent constitutional authority to govern the practice of law within the state of Idaho. *E.g.*, *Idaho Pub. Utils. Comm'n*, 102 Idaho at 674–75, 637 P.2d at 1170–71.

The separation of powers doctrine is key to understanding this inherent power. As explained in *Idaho Public Utilities Commission*:

> The practice of law is so intimately connected with the exercise of judicial power in the administration of justice that the right to define and regulate the practice naturally and logically belongs to the judicial department of the state government. Under the doctrine of separation of powers the courts have inherent power to regulate admission to the practice of law, to oversee the conduct of attorneys as officers of the court, and to control and supervise the practice of law generally, whether in or out of court. It is a prerogative of the judicial department to regulate the practice of law.

102 Idaho at 675, 637 P.2d at 1171 (quoting 7 Am. Jur. 2d, *Attorneys at Law*, § 2). In sum, the judicial branch's duty and power to regulate and oversee the practice of law is a fundamental and inherent judicial power, the essence of an independent judiciary, and a necessary element of the rule of law.

These legal principles have been consistently recognized and upheld by this Court. *See, e.g.*, *In re Edwards*, 45 Idaho 676, 690, 266 P. 665, 670 (1928); *Idaho Pub. Utils. Comm'n*, 102 Idaho at 675, 637 P.2d at 1171. The Idaho Supreme Court's inherent power to govern the practice of law was expressly articulated nearly a century ago in the case of *In re Edwards*, 45 Idaho 676, 266 P. 665 (1928), though the power itself dates back to Idaho's territorial period. In *Edwards*, this Court explained the nature of its power and role in regulating the practice of law:

> The Supreme Court has the inherent power to adopt rules and regulations prescribing the fitness and qualifications of persons seeking to practice before the courts of this state, and to ultimately determine whether, under the statutes, or rules promulgated by it, persons possess the necessary qualifications, or are persons of good moral character. The Supreme Court has the additional inherent power to suspend or disbar an attorney for sufficient cause and jurisdiction so to do does not necessarily depend upon statutory enactments.

45 Idaho at 690, 266 P. at 670.

Although the legislature created the Board to supervise the admission, licensing, and disciplining of attorneys as well as the practice of law in this state. I.C. § 3-402, *et seq*., the

22

"ultimate control" has always been held by the Idaho Supreme Court. *Idaho Pub. Utils. Comm'n*, 102 Idaho at 674, 637 P.2d at 1170. We have delegated authority to the ISB through our rulemaking power by approving and adopting the Idaho Bar Commission Rules. *See id.* at 675, 637 P.2d at 1171; *In re Kaufman*, 69 Idaho 297, 311, 206 P.2d 528, 536 (1949). Thus, the Board "act[s] in an administrative capacity as an arm of the Supreme Court in carrying out its supervisory function," *Idaho Pub. Utils. Comm'n*, 102 Idaho at 674, 637 P.2d at 1170, while the Idaho Supreme Court has retained "the inherent power . . . to ultimately determine whether, under the statutes, or rules promulgated by it, persons possess the necessary qualifications, or are persons of good moral character," *In re Edwards*, 45 Idaho at 690, 266 P. at 670.

Notably, a state supreme court's power to regulate the practice of law is *the* universal system of bar governance across sister jurisdictions. In every state in the nation, the state judiciary retains the final and exclusive authority to discipline lawyers and define and regulate the practice of law. 7 Am. Jur. 2d *Attorneys at Law* § 2 (2024 update). "The power to regulate the practice of law, including the power to admit and to discipline attorneys, is among the inherent constitutional powers of the courts." *Id. See also* Judith L. Maute, Am. Bar Ass'n, *Bar Associations, Self-Regulation and Consumer Protection: Whither Thou Goest?*, 2008 Prof. Law. 53, 54 (2008). This "inherent authority" doctrine stems from the constitutional tenet of separation of powers, and is typically invoked by state supreme courts to invalidate legislation purporting to regulate the legal profession. *Id.* at 54 n. 5. *See, e.g.*, In re *Pet. of N.H. Bar Ass'n*, 855 A.2d 450 (N.H. 2004); *Graham v. Wash. State Bar Ass'n (In re Examination of the Wash. State Bar Ass'n)*, 548 P.2d 310 (Wash. 1976).

Accordingly, while this is an unusual petition—with equally unique forms of relief sought by both the ISB and Doe—this Court has inherent constitutional authority to address and resolve these issues, particularly as concerns Doe's present eligibility to practice law in Idaho.

## III. ANALYSIS

The ISB asks this Court to issue an order permitting it to reject Doe's most recent bar application without conducting a third, successive investigation. It also requests that this Court issue an order prohibiting Doe from refiling an application for admission to practice in Idaho for either (1) a period of five years, or (2) until Doe demonstrates a significant change in his circumstances to this Court. Doe contends that the ISB's petition is improper because he has not engaged in vexatious litigation and the requested order would "retroactively apply a non-existent

23

rule against [him]." Doe also filed a cross-petition against the ISB, asking this Court to render a decision on his present eligibility for admission based on the Rule 208 Character and Fitness Examination Transcript from his second application. He requests that this Court find him presently eligible to practice law and grant him immediate admission to the bar by applying his Delaware Bar Exam score from 2019. The ISB responds that should this Court render a decision on Doe's character and fitness, as Doe requests, it "should consider his entire admissions record."

Doe has raised several other arguments in his cross-petition as well, including defenses under the First Amendment protection of free speech and Fourteenth Amendment challenges based on principles of substantive due process, procedural due process, and equal protection. We will address the issues before us in turn.

**A. The filing of a third successive application only 36 days after in his previous application was denied, coupled with his behavior during the pendency of this matter, demonstrate that Doe has not met his burden of showing that he presently meets the essential eligibility requirements to practice law.**

Doe opposes the ISB's petition seeking to reject his application and prohibit future filings. He argues that the petition is improper for several reasons: (1) the Court would be "blindly rubberstamping the Board's unproven/unadjudicated allegations as dogma," (2) the ISB has falsely mischaracterized Doe's federal litigation as "vexatious," and (3) if the Court relied "on nonexistent rules to render an adverse decision," that would implicate Doe's rights under the Fourteenth Amendment. Doe adds:

> I have lived a ***blameless*** existence and have done nothing that would warrant complete exclusion from the profession. And this is obvious <u>from the fact that these delays have taken place</u>, because if the Board actually had a valid reason to exclude me from the profession, **they would have just issued a decision early last year saying so and telling me to fight it out**.

(Emphasis in original).

Ultimately, the two parties are asking this Court to use its inherent authority to render a decision in their favor; yet, neither side has recited a specific rule that provides for their requested relief. Importantly, this Court has not been asked to review the ISB's denials of Doe's first or second applications, which are final decisions with the force of res judicata. Nor are the parties asking for a new fact-finding process in regard to Doe's third application. Rather, both the ISB and Doe ask this Court to look back at Doe's established admissions history as the grounds for granting their respective petitions, and read the history in the same light they do. Thus, whether we should grant ISB's petition to halt Doe's immediate and successive refiling, or deny the petition

as improper, requires an examination of Doe's admission history. Likewise, whether to grant or deny Doe's cross-petition for immediate admission to the bar requires a determination of his present eligibility. Inasmuch as both determinations are linked to the same facts and allegations, they can be considered together.

As Idaho law recognizes, "the practice of the legal profession is a privilege granted by the state and not a natural right of the individual." I.C. § 3-401. "The right to practice law is a privilege and the admission or exclusion of persons from the right is a judicial power." *In re Lavin*, 59 Idaho 197, 199, 81 P.2d 727, 727 (1938). *See also In re Kaufman*, 69 Idaho at 304, 206 P.2d at 531 (citation omitted). Indeed, "there is no more important duty," than for a court to see that its legal officers "are of proper mental ability and moral character":

> We think there is no more important duty, nor one whose performance is more necessary to the proper functioning of the courts, than to see that their officers are of proper mental ability and moral character. The Legislature may, and very properly does, provide from time to time that certain minimum qualifications shall be possessed by every citizen who desires to apply to the courts for permission to practice therein, and the courts will require all applicants to comply with the statute. This, however, is a limitation, not on the courts, but upon the individual citizen, and it in no manner can be construed as compelling the courts to accept as their officers all applicants who have passed such minimum standards, unless the courts are themselves satisfied that such qualifications are sufficient. If they are not, it is their inherent right to prescribe such other and additional conditions as may be necessary to satisfy them the applicants are indeed entitled to become such officers. In other words, they may not accept less, but may demand more, than the Legislature has required.

*In re Kaufman*, 69 Idaho at 310, 206 P.2d at 536.

Idaho's admission procedures are primarily contained within the Idaho Bar Commission Rules, which are reviewed and approved by this Court, and they provide the qualifications for admission, application procedures, standards for disqualification, and appellate procedures for review. In addition to the successful completion of a degree from an approved law school, the successful completion of the bar examination, and not otherwise being disqualified under I.B.C.R. 210, an applicant must meet several eligibility requirements to practice law:

> (a) The ability to be honest and candid with clients, lawyers, courts, the Board and others;
>
> (b) The ability to reason, recall complex factual information, and integrate that information with complex legal theories;
>
> (c) The ability to communicate with clients, lawyers, courts and others with a high degree of organization and clarity;

25

(d) The ability to use good judgment on behalf of clients and in conducting one's professional business;

(e) The ability to conduct oneself with respect for and in accordance with the law;

(f) The ability to avoid acts which exhibit disregard for the rights or welfare of others;

(g) The ability to comply with the requirements of the Idaho Rules of Professional Conduct, applicable state, local and federal laws, regulations, statutes and any applicable order of a court or tribunal;

(h) The ability to act diligently and reliably in fulfilling one's obligations to clients, lawyers, courts and others;

(i) The ability to act honestly and use good judgment in financial dealings on behalf of oneself, clients and others; and

(j) The ability to comply with deadlines and time constraints.

I.B.C.R. 201.

Complementing these requirements is the rule for the disqualification of applicants under Rule 210(a)(3). These are known as the character and fitness standards, and they provide the basis for disqualifying an applicant whose conduct substantially evinces an inclination to:

(A) Be dishonest;

(B) Take unfair advantage of others;

(C) Be disloyal to those to whom loyalty is legally owed;

(D) Be financially irresponsible in business, professional or personal matters;

(E) Support or advocate the overthrow of the government of the United States by force;

(F) Engage in the unauthorized practice of law;

(G) Violate reasonable rules of conduct governing any activity in which Applicant has been engaged;

(H) Fail to exercise substantial self-control, including excessive and continuing violation of traffic rules, improper use of drugs or excessive use of alcohol; or

(I) Be mentally or emotionally unstable to the extent that, in the opinion of the [Character and Fitness] Committee or Board, the Applicant is not suited to practice law[.]

I.B.C.R. 210(a)(3).

Where responses and materials in a bar application implicate eligibility criteria relating to character and fitness, the application may be referred to the Committee. I.B.C.R. 208(b). On reasonable notice, the Committee has the authority to require a character and fitness examination "regarding any matter deemed relevant by the Board, [Character and Fitness] Committee or Bar

26

Counsel to a proper consideration of the pending Application." I.B.C.R. 208(c). The Committee shall then "[s]ubmit to the Board its findings of facts, conclusions of law and recommendation regarding any denial or conditional admission," I.B.C.R. 209(c)(5). The Board may approve, deny, or modify the recommendation; issue a recommendation of conditional admission; or request further investigation. I.B.C.R. 215(a). An applicant may challenge the Board's decision by petitioning the Board for a show cause hearing, which will be scheduled at a time convenient to both the applicant and Board. I.B.C.R. 215(d) and (f). Following the show cause hearing, an applicant may petition the Idaho Supreme Court for review of the denial of his application. pursuant to Idaho Bar Commission Rule 216(a). I.B.C.R. 215(g). The Board's decision to approve or deny an application becomes final unless the applicant requests a show cause hearing. I.B.C.R. 215(b).

Here, the Board denied both of Doe's first and second bar applications on character and fitness grounds. Doe challenged the denial of his first application by requesting a show cause hearing. When the Board adopted the hearing officer's recommendation to deny Doe's application, Doe again challenged the determination and petitioned this Court pursuant to Idaho Bar Commission Rule 216. We affirmed the Board's denial and the decision became final. While Doe also sought a show cause hearing on the denial of his second application, he dismissed the challenge and submitted a third bar application instead. This rendered the second decision final pursuant to Idaho Bar Commission Rule 215(b).

Doe claims that the Board's two decisions denying his applications were retaliation for the federal lawsuits he filed against them and maintains that those suits were a last resort to defend his rights. In examining his past conduct, Doe now concedes there are two incidents in his history that were mistakes but argues that neither warrants his exclusion from the legal profession. First, Doe points to his "rudeness in the complaint filed in *[Doe] I* back in March of 2022," which he already "owned up to" and has "[taken] the steps necessary to correct [his] unfortunate mishap by apologizing and filing a *Notice of Errata*." Second, he states: "The only thing I have in my background relevant to a moral character inquiry is a seven (7) year old unemployment issue where I guessed income during the receipt of unemployment benefits and had to pay it back, which I did, before entering my first year of law school in 2016."

27

The Board's two prior decisions, the findings by the hearing officer, and Doe's continuing conduct all contradict Doe's version of events. Most recently, the Board determined that Doe had failed to meet his burden of proving several essential eligibility requirements to practice law:

> 1) the ability to be honest and candid with clients, lawyers, courts, the Board and others under I.B.C.R. 201(a);
>
> 2) the ability to use good judgment on behalf of clients and in conducting one's professional business under I.B.C.R. 201(d);
>
> 3) the ability to avoid acts which exhibit disregard for the rights or welfare of others under I.B.C.R. 201(f); and
>
> 4) the ability to comply with the requirements of the Idaho Rules of Professional Conduct, applicable state, local and federal laws, regulations, statutes and any applicable order of court or tribunal under I.B.C.R. 201.

This Court's examination of Doe's history, and his present ineligibility for purposes of considering his third application for admission to the bar, will focus on these same categories. We stress that our analysis is *not* a review of the Board's prior decisions to deny Doe's first and second applications, but rather it is an examination of Doe's character and fitness for the purposes of addressing both the ISB's petition and Doe's cross-petition as to Doe's third application. However, the Board's earlier findings form the starting point for considering the relief requested in the petition and cross-petition.

### 1. Doe continues to show that he lacks the ability to be honest and candid with clients, lawyers, courts, the Board, and others under I.B.C.R. 201(a).

In denying Doe's earlier applications, the ISB noted repeatedly that "[Doe's] ability to be honest and candid under I.B.C.R. 201(a) was the greatest concern for the Board." As demonstrated by the facts recited above, not only did Doe's omissions demonstrate extreme dishonesty before the ISB, the nature of the undisclosed incidents also reveal a consistent pattern of deceit. Justice Horton also found that Doe took "a very narrow view of his duty to disclose information relating to investigations," and his "actions to conceal conduct directly relating to his character and fitness to practice . . . is deeply troubling." In addition to his history of material omissions are the numerous statements Doe has made in emails, court filings, and other documents in the record where he made assertions without supporting facts, citations, or evidence. This includes "transcripts" of alleged conversations recounting events between Doe and ISB personnel without supporting affidavits or documentation.

In the proceeding currently before this Court, Doe has continued to demonstrate an inability to be honest and candid by incorrectly representing the results obtained in his federal litigation against the Bar. For example, he claimed that "the federal court *forced* the schoolyard bullies [the Board] to finally issue a decision" on his second application, when, in fact, Doe was never granted any declaratory or injunctive relief from the federal court. *See Doe III*, 647 F. Supp. 3d at 957; *Doe I*, 643 F. Supp. 3d at 1102 n.4 (noting that *Doe II*, seeking emergency injunctive and declaratory relief, was voluntarily dismissed by Doe with prejudice after this Court granted his motion to extend time to transfer his MBE score).

Moreover, of ongoing concern are Doe's continuing statements concerning the fraudulent collection of unemployment benefits in Delaware that demonstrate no accountability. This was an incident undisclosed by Doe in his first application to the ISB. Notwithstanding his apology, Doe continues to assert that it was a "simple mistake"—an excuse the hearing officer, the Committee, and the Board have never found to be credible. It is patently unbelievable that anyone would admit to inventing and reporting hours worked to a state agency, without knowing what he was doing was wrong. Doe's discussion of the unemployment incident at the Rule 208 Examination was even more concerning. Doe stated:

> So if I could go back now I would have just told them -- I would have either gone in there and told them I don't understand, **or I would have just not reported it**, or just gotten off the unemployment altogether.

(Emphasis added). While the incident itself is remote in time, this recent admission is deeply troubling because it indicates that Doe believes that concealing his actual earnings was a permissible, viable alternative to being completely honest in his dealings.

We conclude that there is substantial evidence indicating Doe's continued inability to be honest and candid with clients, lawyers, courts, the Board, and others as required under Idaho Bar Commission Rule 201(a). Accordingly, Doe has failed to prove eligibility under Idaho Bar Commission Rule 201(a).

### 2. *Doe continues to demonstrate that he lacks the ability to use good judgment on behalf of clients and in conducting one's professional business under I.B.C.R. 201(d).*

In denying Doe's second application, the Board noted recent communications and incidents where Doe exhibited conduct that failed to meet this eligibility requirement. These included Doe's attempts to hold the ISB to "promises" and statements it never made, inappropriate and insulting emails, and *ad hominem* attacks on Judge Wolfson. In short, the Board's previous findings twice

29

established that Doe has demonstrated an ongoing pattern of making false or reckless allegations, as well as unprofessional and inappropriate statements, in his communications with Bar Counsel, the Board, and in his filings before state and federal tribunals.

This conduct has continued as Doe persists in exhibiting the exact behavior summarized by Justice Horton in reviewing Doe's first application: a "pattern of demonizing those who make decisions adverse to his interests. He ascribes improper motivations, ethical lapses, and ineptitude to such individuals." For example, in his cross-petition in *this* action, Doe made inappropriate statements impugning the integrity and professionalism of members of this Court, further demonstrating an ongoing pattern of attacking decision makers. In this case, he did so even before they rendered a decision.

Doe specifically accused one justice of improper conduct in another proceeding in which Doe had no involvement, stating that the justice's comments to counsel during a particular oral argument rose "to the level of heated gratuitous–insults [sic] where [he] proceeded to *passionately rail against* [an attorney's] conduct." (Emphasis in original). With apparently no sense of irony, Doe further counseled this Court as follows:

> A tribunal does not give the appearance of impartiality when it employs such heated rhetoric and denunciations, and especially not when it's [sic] written order dogmas a finding of professional misconduct prior to the required due process. Rather than playing to an audience, the job of the impartial tribunal is to deal with the facts and issues at hand in a professional manner.

In his briefing, Doe also chastised two justices of this Court, accusing them of wrongdoing by not coming to his defense in the application process on his second application because they were "afraid to tell the ISB the words 'NO' 'STOP' or 'YOU GUYS ARE IN THE WRONG.' **It is not a matter of if. . . . . . [sic] but when!!!!**" (Emphasis in original).

To be clear, Doe's comments do not display bad judgment merely because he criticized two justices. Rather, Doe continues to demonstrate his recklessness by discussing a case in which he had no involvement and does not appear to appreciate the basis for the concerns expressed by all five justices during that oral argument. Moreover, Doe does not appreciate that this Court's role in the bar application process is ordinarily one of appellate review and, therefore, it would be inappropriate for individual justices to intervene on behalf of a particular applicant. We have adopted the Bar Commission Rules to provide guidance to the ISB on processing applications.

After reviewing the totality of the record, we agree with the ISB that Doe's conduct has not discernibly changed, let alone improved, since the Board's prior assessments. The record and

briefing before us provide ample proof that Doe's conduct continues to show a lack of good professional judgment under Idaho Bar Commission Rule 201(d). Of particular concern are his tendencies to use unprofessional language and aim reckless attacks at attorneys and judges involved in both his state and federal lawsuits. Thus, he has failed to prove eligibility under this prong.

### 3. Doe continues to demonstrate that he lacks the ability to avoid acts which exhibit disregard for the rights or welfare of others under I.B.C.R. 201(f).

As was originally found by the hearing officer, the Board has twice determined that Doe's "history of using litigation and bar disciplinary proceedings in a vindictive fashion" demonstrates disregard for the rights or welfare of others. This continues to be the case. While Doe continuously argues that his federal litigation in Idaho has been a last resort and a necessary defense of his rights, the finding in prior adjudications regarding Doe's applications is that he has consistently shown a "pattern of demonizing those who make decisions adverse to his interests." As noted above, this can be seen throughout Doe's litigation history.

Doe has filed three successive lawsuits with the United States District Court for the District of Idaho. *Doe I* was filed on February 28, 2022, the same month that this Court affirmed the denial of his first bar application. *Doe II* was filed on June 19, 2022, two days after the Committee voted to defer Doe's second bar application in order to carry out a character and fitness examination. *Doe III* was filed on November 19, 2022, just a few days after Doe's termination from his position as a law clerk for Judge Brown. All three cases were simultaneously pending in federal district court before a decision in *Doe I* issued on November 29, 2022. Even the federal district court noted in *Doe I*: "The timing of the filing was not coincidental. Filing the lawsuit so close in time to the denial suggests that the lawsuit is in fact backward-looking, to redress the denial." *Doe I*, 643 F. Supp. 3d at 1113.

Importantly, we recognize that none of these federal actions were found by the presiding courts to be frivolous, nor has any court adjudicated Doe to be a vexatious litigant. We do not cite these cases to address the merits of Doe's federal claims, but to observe that the timing of the federal proceedings—and the specific language he used in his pleadings—are evidence of his historic and ongoing pattern of demonizing his opponents and using litigation in a vindictive fashion. For example, as noted above, in *Doe I*, Doe made false and gratuitously offensive statements against specific ISB personnel. Doe's past defenses to these statements were that they are "facts" that put the "case in context," rather than an opinion or criticism of either individual.

31

Yet Doe provided no evidence to support his "facts" and the subsequent evidence admitted by the Bar ultimately established that Doe's "facts" were patently false.

Doe has attempted to excuse his conduct by noting that he "got really zealous and passionate" when writing his brief to "correct an injustice that was going on." Indeed, Doe has conceded that he becomes "really zealous and love[s] to fight," just as he likes "to be artistic" and "paint the picture" for the court. Of great concern, Doe explained in his cross-petition that his moments of "disrespectful, rude, and/or combative choice of words" should not be condemned as they are *traits expected in a lawyer*. (Citing *In re Simmons*, 414 P.3d 1111, 1121 (Wash. 2018) ("It evinces the type of reasonable advocacy any litigator could ethically exercise on behalf of his or her clients . . . .")). We do not agree. Being disrespectful, rude, petty, defamatory, or vindictive does not constitute "reasonable advocacy" or ethical conduct. Doe's conduct and language have consistently shown a lack of civility, extreme unprofessionalism, and a level of vindictiveness that goes beyond mere zeal. Such behavior indicates that Doe is in desperate need of correction, not commendation.

For example, Doe's personal email communications with Bar Counsel and the Board are equally overzealous, inappropriate, and, at times, bizarre. For example, Doe has made statements like: "I am not about to let your evil and wickedness (as well as your dishonesty) change the person I am." In one late night email, Doe stated:

> You need to learn by this point that I am not just going to walk away like all the others you guys screw over; you are not going to get rid of me no matter how hard you try. I will be around for many years to come to grace you with my presence and keep you guys in check. Deep down, Joe [Bar Counsel], you know your life would be boring without me in it. You are like Captain Hook I am your Peter Pan.

This email is surprisingly similar to a statement Doe made in an earlier show cause hearing, when he described former Dean Ben Cramer of Concordia Law School as Captain Hook: "the wonderful memories I have of that law school, it's like Neverland and he's Captain Hook. He's a necessary evil, and the story wouldn't be the same without him."

The record also demonstrates that Doe too often crafts his arguments in a religious light, and with a troubling tendency to literally "demonize those who make decisions adverse to his interests." For example, in his briefing before this Court, Doe repeatedly described the Board's actions, personnel, and decisions as "evil and wickedness," "evil people," "twisted," "immoral," and accused them of "cruel, wicked, and antagonizing *ad-hominem* attacks." This tendency is also present in one of Doe's recent emails:

32

Since I moved back to Idaho in June of 2021, I chose to dedicate my life to Christ and become baptized and I am a child of the King. I am not scared of you guys, I am not flustered by your bullying, and I am not about to let your evil and wickedness (as well as your dishonesty) change the person I am. It is so twisted because I am a person of paramount character and integrity and I am being blocked from my calling by persons who are (by all objective evidence available to me) immoral people who are trying to keep me out of my calling by trying to allege—falsely—that I lack requisite moral character and fitness.

In short, we find that the pattern of "demonizing" behavior found by Justice Horton three years ago persists in Doe's conduct today. Accordingly, we conclude that Doe's conduct continues to exhibit a disregard for the rights and welfare of others. He has failed to establish this eligibility requirement under Idaho Bar Commission Rule 201(f).

4. ***Doe has continued to demonstrate an inability to comply with the requirements of the Idaho Rules of Professional Conduct, applicable state, local and federal laws, regulations, statutes and any applicable order of court or tribunal under I.B.C.R. 201.***

In examining Doe's first application, Justice Horton concluded that some incidents in Doe's history showed his inclination to violate reasonable rules of conduct. Based on the record before us, outlined above, we conclude that Doe continues to show an inclination to violate at least Idaho Rule of Professional Conduct 8.2(a), which prohibits an attorney from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ." For example, in his federal litigation in Delaware, Doe made several reckless statements in his motion for reconsideration accusing Judge Wolfson of improper influence and dishonesty. Likewise, before us, Doe has challenged members of this Court—both sitting on this case, and not—by questioning their qualifications and integrity while serving on Idaho's bench. Again, this conduct demonstrates a continuing penchant for reckless disregard of others that transcends mere criticism.

Tellingly, in this proceeding, Doe continued to sign his filings as "Respondent and Attorney for Respondent," even though he had been previously cautioned not to hold himself out as an attorney. He only changed his behavior after this Court informed him that we would strike any future filings wherein he designated himself as an attorney. Likewise, despite being directly ordered to stop using his actual name and, instead, use the alias "John Doe" in the caption of "all future pleadings" in this case, Doe continued to use his actual name in the caption. Again, this behavior only changed when this Court ordered that "any future pleadings filed by either party that show an erroneous caption will be STRICKEN." (Emphasis in original). Thus, not only has Doe

33

demonstrated a tendency to breach the rules and laws governing attorney conduct, but he exhibits a disregard for court orders such as those protecting confidentiality—even when it is in his own interest.

Altogether, Doe's conduct has not changed over time but has stayed consistent in his willingness to bend or break rules of professional conduct and judgment, and then defend his actions as mere "zeal." Accordingly, we conclude that Doe's conduct evidences an inclination to violate reasonable rules of conduct governing the activities in which he has been engaged.

### 5. *We deny Doe's cross-petition for immediate admission to the bar.*

Doe has filed a cross-petition seeking immediate admission to the Idaho bar. In light of the foregoing discussion, we conclude that Doe has failed to prove he is presently eligible to practice law in Idaho. Doe concedes, "my flaws are abundant," yet he repeatedly blames others for his difficulties. Doe may try to paint himself as a man "more sinned against than sinning," William Shakespeare, *King Lear* act 3, sc. 2, 1. 63, but the record speaks for itself. More specifically, and as discussed above,, there are at least four categories in which Doe still fails to meet his burden of proving the essential eligibility requirements to practice law. *See* I.B.C.R. 201, 201(a), I.B.C.R. 201(d), and I.B.C.R. 201(f). The totality of the evidence in the record fully supports this conclusion. Thus, there is no reason to grant Doe the extraordinary relief he is seeking.

Finally, Doe contends that if he has "blemishes" in his record, this Court should apply Washington's "sufficiency of punishment" analysis. *In re Simmons*, 414 P.3d at 1117. Doe insists that there are mitigating circumstances that warrant his admission; namely, that he has apparently completed four credits of CLEs focusing on legal ethics and professionalism. We do not agree with Doe that a handful of CLE courses on ethics are sufficiently indicative of him renouncing a history of dishonesty and demonizing opponents, especially when he has continued to display similarly concerning behavior in this case. Instead, Doe's last argument on his current eligibility relies on a plea that he has been punished enough for his past mistakes by being kept out of legal practice. Per *Simmons*, financial and personal consequences are certainly a "punishment" considered in its multi-factor analysis. Equally clear is that Doe's denied admissions have been hard on him and a severe consequence of his past. For all his faults, Doe appears to be genuine in his desire and passion to enter the legal profession. However, Washington's "sufficiency of punishment" factor is *one of many* for a court to consider in evaluating new bar applicants. *See id.* at 1117. Thus, even if we were to adopt Washington's approach—which we have not—and

34

consider sufficiency of punishment as a mitigating circumstance in our evaluation of Doe's present eligibility, for the reasons explained herein, Doe has still failed to prove he is currently eligible for admission under several prongs of Idaho Bar Commission Rule 201.

In sum, because Doe has presently failed to meet the eligibility requirements to become an Idaho lawyer, we must deny his cross-petition for immediate admission to the bar. He is not presently eligible. Because of our decision to deny his cross-petition, we need not address Doe's arguments that his Delaware Bar Exam can be substituted "as a full UBE transfer."

## B. Doe's First Amendment Defenses

Doe offers additional defenses against the ISB's petition, arguing that it is "another attempt to further retaliate and chill [Doe] from seeking redress in federal court." He also argues that the petition is an attempt to "punish and chill First Amendment protected speech by imposing a content and/or viewpoint based restriction." As with his earlier arguments, Doe contends that the ISB's "request is premised on the boldfaced lie that [Doe's] litigation against them has been frivolous." (Emphasis in original).

"The First Amendment of the United States Constitution, which guarantees the right to free expression, peaceable assembly and seeking redress with our government, applies to the states through the Fourteenth Amendment." *State v. Manzanares*, 152 Idaho 410, 424, 272 P.3d 382, 396 (2012). "Citizens have a right under our constitutional system to criticize government officials and agencies." *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 269 (1957). Courts are no exception: they "are not, and should not be, immune to such criticism," for "[g]overnment censorship can no more be reconciled with our national constitutional standard of freedom of speech and press when done in the guise of [determining] 'moral character,' than if it should be attempted directly." *Id.*

However, courts have consistently held that bar commissions may screen applicants and conduct disciplinary investigations for speech and conduct within constitutionally permissible limits. *L. Students Civ. Rts. Rsch. Council, Inc. v. Wadmond*, 401 U.S. 154, 167 (1971). Short of chilling free speech and association, the United States Supreme Court has held that it will not disturb a state's screening processes to make determinations on an applicant's character. *Id.*; *In re Converse*, 602 N.W.2d 500, 506 (Neb. 1999) (even assuming an applicant's conduct "may have been protected by the First Amendment . . . a bar commission is allowed to consider speech and conduct in making determinations of an applicant's character"). As this Court recently noted, "attorneys do not lose all First Amendment protections once admitted to the Idaho State Bar," but

they " 'must temper [their] criticisms in accordance with professional standards of conduct.' " *Schiermeier v. State*, 171 Idaho 311, 324, 521 P.3d 699, 712 (2022) (quoting *U.S. Dist. Ct. for E. Dist. of Wash. v. Sandlin*, 12 F.3d 861, 866 (9th Cir. 1993)). Idaho's "professional standards of conduct are designed '[t]o maintain the fair and independent administration of justice,' and therefore, [this Court does] not condone behavior that undermines this effort." *Id.* (first alteration in original) (quoting I.R.P.C. 8.2(a) cmt. 3).

Here, Doe asserts that the ISB's petition is an attempt to chill his free speech for seeking redress in federal court. A similar argument was made to the Supreme Court of Mississippi when an applicant argued that the state's Board of Bar Admissions "violated his First Amendment right to free speech by holding against him his petition for redress of grievances," including two lawsuits filed against the board itself. *In re Dean*, 972 So. 2d 590, 597 (Miss. 2008). The applicant's litigation history was investigated to determine the validity of the suits and the applicant's conduct as it related to his dealings with the legal system. *Id.* The committee ultimately "found Dean's pattern of litigation indicated that Dean has a habit of filing meritless and retaliatory suits." *Id.* The committee also explained that it "would not dispute Dean's right to file civil lawsuits" because it was "the validity of the lawsuits that causes concern, not the right to file." *Id.* at 598. Thus, Dean not only failed to show that the denial of his application was arbitrary and capricious, but that his First Amendment right to free speech was violated. *Id.*

Comparable arguments by applicants have been similarly rejected by state courts where bar admission procedures make an appropriate consideration of speech and conduct in determining an applicant's character and fitness to practice law. *See In re Kauffman*, 499 P.3d 801, 813 (Or. 2021) (applicant claimed that his conduct was protected "because he was standing up to bigotry," but nothing in the record suggested that the actions taken by the admissions board or staff "bore any connection to applicant's sexual orientation"); *In re Roots*, 762 A.2d 1161, 1170 (R.I. 2000) (while the First Amendment prohibits a court from denying bar membership to an applicant "because of his political beliefs and unorthodox political and social ideas," they "may be *relevant* in assessing" candor, honesty, a willingness to abide by the attorney's oath, and the ability to support the constitution and laws of the United States); *In re Converse*, 602 N.W.2d at 506 (rejecting the applicant's First Amendment arguments because they would render the bar screening process unconstitutional "beyond academic examination and an extremely minimal check for serious, concrete character deficiencies").

The same may be said of Doe's case at bar. While Doe and the ISB have undoubtedly fallen into a contentious relationship, the ISB did not file this petition or determine that Doe was ineligible to practice law merely because he filed *Doe I*, *Doe II* or *Doe III*. Rather, it denied his applications and sought relief with this Court because Doe's overall *conduct*, dating back to his undergraduate years and continuing through the present, has demonstrated inclinations to be dishonest, to disregard the rights and welfare of others, to exercise poor professional judgment, and to violate reasonable rules of conduct. Doe's statements in the record and his pleadings show a proven track record of false allegations, reckless insinuations, and a pattern of "demonizing those who make decisions adverse to his interests," with Doe "ascrib[ing] improper motivations, ethical lapses, and ineptitude to such individuals." As the Supreme Court of South Dakota has articulated:

> There can be such an abuse of the freedom of speech and liberty of the press as to show that a party is not possessed "of good moral character," as required for admission to the bar of this state . . . When a man enters upon a campaign of vilification, he takes his fate into his own hands, and must expect to be held to answer for the abuse of the privilege extended to him by the Constitution. An attorney . . . must be presumed to know the difference between respectful, fair, and candid criticism, and scandalous abuse, of the courts which gave him the high privilege, not as a matter of right, to be a priest at the altar of justice.

*In re Egan*, 123 N.W. 478, 488 (S.D. 1909) (quotation marks and citation omitted). In sum, the First Amendment does not grant license to an officer of the court to make false allegations and reckless insinuations about others in court filings and other professional settings without consequence.

Doe's previously denied admissions were based on his conduct and moral fitness to practice law, not his pursuit of a redress of grievances in federal court. The ISB has an obligation to determine whether an applicant is fit to practice law in the state of Idaho, and that includes examining an applicant's speech insofar as it is demonstrative of his eligibility to practice law in this state. This petition was filed in furtherance of that obligation and is not an infringement on Doe's free speech. In sum, if Doe wishes to become an Idaho lawyer, his fitness will continue to be judged by examining his conduct.

### C. Because Doe has not demonstrated that he is fit to practice law for a sufficient time before filing a third successive application, the ISB is not required to process Doe's current application. Doe is prohibited from refiling an application for two years from the date of this Opinion.

The ISB maintains that it brought its petition to this Court because Doe has not demonstrated a significant change in circumstances since his second application was denied, and

37

it would be a waste of ISB resources to process a third application so soon in the absence of such evidence. The ISB argues: "[Doe's] vexatious conduct and his use of litigation against those he perceives to have wronged him has only increased over time," and processing the third application risks further litigation if it "is not processed in the way [Doe] believes is appropriate."

Doe has hinged several of his arguments on the ISB's use of the word "vexatious." He argues that under procedural due process, this Court cannot grant the petition because the "vexatious allegation" has been raised for the first time before this Court. Additionally, Doe argues that substantive due process and equal protection principles bar this Court from granting the petition because it asks this Court to rely on "non-existent rules to render an adverse decision against [Doe] as an exception to standard practices." We take exception to the contentions raised by both sides on this matter.

First, the ISB was incorrect to characterize Doe's litigation history as "vexatious" to the extent that this term has become a term of art in the Idaho courts. Justice Horton and the Board properly determined that several of Doe's past litigation attempts were "frivolous," namely the Ferguson litigation, a discrimination/retaliation claim against the Delaware Office of Animal Welfare, and the disciplinary complaints against Aaronson, Brady, and Ferguson. However, no court has ever adjudicated Doe to be a "vexatious litigant." Neither have the federal courts in Idaho ever determined that the merits of Doe's claims were frivolous. Thus, Doe is correct that this Court should not render such a decision here and now. "Determining a person to be a vexatious litigant is within the sound discretion of the administrative judge," and the governing legal standard to designate someone a vexatious litigant is outlined in Idaho Court Administrative Rule 59. *Colafranceschi v. Moody* (*In re Prefiling Ord. Declaring Vexatious Litigant*), 164 Idaho 771, 775, 777, 435 P.3d 1091, 1095, 1097 (2019). Subsection (d) of the rule "permits an administrative judge to declare someone a vexatious litigant if the judge makes a finding that the person has engaged in any one of four types of conduct." *Id.* at 777, 435 P.3d at 1097 (citing I.C.A.R. 59(d)(1)–(4)). If the ISB is using the petition to effectively label Doe a vexatious litigant, then it has chosen the wrong forum.

However, Doe's arguments are not without issue. Despite the ISB's poor choice of words, Doe has failed to prove he meets several essential eligibility requirements to practice law in Idaho. Doe has attempted to address these points repeatedly and the Board has twice found him wanting. These decisions are final and fully adjudicated. While nothing in the rules prohibits a denied

applicant from refiling an application for admission three times, Doe has abused the application process with dogged, consecutive attempts that resurrect the same arguments and history without demonstrating a substantial change in his circumstances that establishes he now meets the essential eligibility requirements that the Board previously found lacking. Indeed, Doe's conduct has not improved over time; in fact, it has intensified while he attempts to reargue prior incidents and raise the same issues that have been rejected by the Board in its prior decisions. While Doe makes assurances that he has now learned from his mistakes, these apologies ring hollow in the face of his ongoing conduct. The record and briefs before us provide ample proof that he has not changed. As noted at oral argument, past events cannot be altered but conduct and character can. It is up to Doe to demonstrate that he has made substantial changes in those areas where the Board has previously found him lacking.. Thus, we agree with the ISB that it need not process Doe's third application, submitted on April 12, 2023, and grant the ISB's petition in this regard. Accordingly, the ISB shall refund Doe's application fee.

As to the remedy the ISB requests in this case, there is scant jurisprudence to guide us on the length of time, if any, Doe should be prohibited from refiling to sit for the Idaho Bar Examination. The ISB has not provided any legal or factual justification for why a five-year prohibition is merited in this circumstance. However, we also cannot condone Doe's abuse of Idaho's Bar Commission Rules by repeatedly reapplying for admission without ever showing a substantial change in his circumstances that render him eligible to practice law. In his prior applications, the Board provided Doe with lengthy proposed findings and conclusions and the Idaho Bar Commission Rules provided him with the opportunity to request a show cause hearing to contest them. Doe requested these appellate proceedings twice. The first application went to a show cause hearing, which resulted in written findings from Justice Horton and a final determination from the Board. Doe again challenged that decision and this Court affirmed the Board's order. Doe's second application did not proceed to a show cause hearing because Doe voluntarily dismissed his petition. Further, Doe's proclivity for resurrecting the same history and arguments has become a significant drain on the ISB's resources, and has diverted Bar Counsel— as well as deputies from the Attorney General's office serving as counsel of record for the named ISB defendants in the federal cases—from their other duties.

In light of the detailed written decisions specifying the Board's concerns with his history and explaining why he has failed to demonstrate that he is eligible to practice law, we conclude

that Doe has been fully informed of the factual basis and reasons why his first two applications have been rejected. His response to those lengthy decisions was merely to take four CLE credits and argue that he has now resolved all of the Board's concerns. Yet, his litigation in federal court and in this Court has clearly demonstrated that he continues to engage in the same behaviors that caused the Board to determine he failed to meet the essential eligibility requirements to practice law. Simply put, Doe has failed to take the necessary time between successive applications to effectuate and demonstrate a sincere change in his character and fitness. Thirty-six days simply is not long enough to show the type of improvement necessary to overcome the previously noted concerns with Doe's eligibility to practice law in Idaho. Instead of working to establish how he addressed the specific concerns identified in the Board's two prior decisions, Doe has continued to litigate against almost everyone involved in the prior decisions, arguing they were wrong. As noted, this has required Bar Counsel to spend at least 50% of his time on Doe when addressing his successive applications, appeals, and lawsuits.

Courts in our sister states have recognized that the passage of time is a significant factor in evaluating the rehabilitation of character, and to establish a reformation of conduct. *See In re Wiesner*, 94 A.D.3d 167, 173, 943 N.Y.S.2d 410, 415 (N.Y. App. Div. 2012) (holding that the passage of time was significant to evaluate a bar applicant's criminal history to determine whether he "sufficiently abandoned" his prior criminal conduct); *Appl. of Avcollie*, 637 A.2d 409, 413 (Conn. Super. Ct. 1993) ("A redemptive and rehabilitative life requires the passage of time for documentation. The more serious the misconduct, the more time required to meet the burden of moral trustworthiness."); *Frasher v. W. Va. Bd. of L. Exam'rs*, 408 S.E.2d 675, 684 (W. Va. 1991) (stating that denied applicants may resubmit an application for admission after offering proof of rehabilitated character, and noting that time is a factor to consider). To be sure, the passage of time *alone* is insufficient to demonstrate rehabilitation. *Frasher v. W. Virginia Bd. of L. Examiners*, 408 S.E.2d 675, 684 (W. Va. 1991); *The Fla. Bar re Jahn*, 559 So. 2d 1089, 1090 (Fla. 1990). Nevertheless, we agree with these sister jurisdictions that time is a necessary component to demonstrate a significant change in circumstances and document rehabilitated conduct.

In this instance, given Doe's track record, we conclude that a reasonable period of rehabilitation is necessary for Doe to demonstrate a meaningful change in character and fitness, and to document his rehabilitation. Thus far, Doe has hardly allowed any time for rehabilitation, much less shown any demonstrable changes in his fitness to practice law. Indeed, as Doe has filed

successive applications, the same character and fitness shortcomings have continued to occur and remain unaddressed. While we cannot say that five years is necessary to make such a showing, based on the totality of the circumstances before us, we conclude that two years may be sufficient. Accordingly, we hold that Doe may not submit a fourth application to sit for an Idaho bar examination for a period of two (2) years from the issuance of this Opinion. If Doe submits a fourth application, it remains his burden to demonstrate that he can meet the standards to practice law at that time pursuant to the Idaho Bar Commission Rules. It is our hope that by turning his focus to rehabilitation and accountability for a season, Doe can make this a reality.

## VI. CONCLUSION

For the foregoing reasons, we grant the ISB's petition in part and deny it in part. We grant the ISB's petition to reject Doe's third successive application to the ISB to sit for the Idaho Bar Exam, submitted on April 12, 2023, and order the ISB to refund his application fee. Doe is prohibited from filing a new application to sit for the Idaho Bar Examination for two (2) years from the date of this Opinion. Doe's cross-petition for immediate admission to the Idaho Bar is denied.

Chief Justice BEVAN, Justice MOELLER, Justice ZAHN, Justice Pro Tem BURDICK, and Justice Pro Tem HIPPLER concur.